IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        v.                     )      No. 3:05-CR-20
                               )      (JARVIS/GUYTON)
JAMES RAY ROUNDTREE,           )
                               )
                Defendant.     )

## REPORT AND RECOMMENDATION

This case is before the Court on the defendant's Motion to Suppress Evidence [Doc. 12]. This motion was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on May 5, 2005. Assistant United States Attorney Tracee Plowell was present representing the government. Assistant Federal Defender Jonathan Moffatt was present representing the defendant, James Ray Roundtree. The defendant was also present. At the conclusion of the hearing, defense counsel requested the opportunity to file a post-hearing brief. The Court granted this request. The defense filed a supplemental memorandum [Doc. 18] on May 16, 2005, and the government filed a supplemental response [Doc. 19] on May 26, 2005. The defendant filed a reply [Doc. 20] on June 1, 2005. The Court took the suppression motion and related filings under advisement on June 2, 2005.

The defendant, James Ray Roundtree ("Roundtree") has been indicted [Doc.1] on a one-count indictment, alleging that on November 16, 2004, the defendant was a felon in possession of a firearm and ammunition. Roundtree has moved to suppress [Docs. 12, 18, and 20] all items of evidence, including any statements, stemming from the November 16, 2004 search of the car he was

1

driving, alleging that:

> (1) The officer lacked probable cause to stop and seize him,
>
> (2) The length of the detention exceeded the purpose of the stop, and
>
> (3) The drug dog's actions did not provide a basis for searching the car.

The government responds [Docs. 13 and 19] that the officer had probable cause to stop the defendant for a traffic violation, the defendant's detention did not exceed the purpose of the stop, and the record reveals that the canine alert gave the officers probable cause to search the car.

## I. FACTS

The government called the sole witness who testified at the hearing on this matter. Terry Pate ("Pate"), testified that he is an officer with the Knoxville Police Department ("KPD"). Pate has been a KPD Officer for five (5) years, and he has been a patrol officer in the Mechanicsville area for two (2) years. He was on patrol in that area in November 2004. Pate testified that Mechanicsville is a "high crime," residential area. He said that drug and prostitution crimes are prevalent in the area. He further testified that he has made hundreds of arrests during his tenure as a patrol officer, and that ten to twenty percent (10 % - 20 %) of all of the arrests were narcotics related.

Pate testified that on the day in question, November 16, 2004, he was working his regular tour of 7:00 a.m. to 3:00 p.m. He was alone in a marked vehicle. At approximately 12:15 p.m., he saw a silver car drive slowly down an alleyway. This alleyway was in an area where the KPD had received numerous complaints about drug and prostitution activity. Pate testified that when the vehicle emerged from the alleyway, he saw that the driver was not using a seat belt. Pate

testified that he also recognized James Roundtree as the driver. He said that he has known of Roundtree since childhood, growing up in the Sutherland Avenue area of Knoxville.

Pate testified that he pulled Roundtree over on University Avenue. He said that Roundtree immediately tried to get out of the vehicle, but Pate told Roundtree to stay in the car. Pate then asked Roundtree for his driver's license and registration. Pate said that Roundtree told him that Roundtree did not have a driver's license. Pate testified that Roundtree looked around in the front seat area of the car, as if searching for the registration, but that Roundtree did not look in the glove box. Pate testified that he asked Roundtree twice to check the glove box, because that is generally where people keep their registration. He said that Roundtree ignored his initial request. After Pate's second request to check the glove box, Roundtree just cracked the glove box and turned his body to try to shield the glove box from Pate. Further, Roundtree, according to Pate, did not look in the glove box but stuck his left hand inside and then closed it quickly.

Pate further testified that he has done thousands of traffic stops. He testified that Roundtree was "overly nervous." Pate said that when Roundtree moved his body so as to shield Pate's view of the glove box, Pate drew his weapon to his side, but then put the weapon back into his holster when Roundtree came out with nothing. Pate testified that he was concerned about his safety and did not want to be vulnerable in case Roundtree drew a weapon. Pate also testified that Roundtree's history was a factor in him drawing the weapon to his side. Pate testified that he was aware that Roundtree had a history of robbery and drug crimes. Pate considered Roundtree to be a violent offender. Pate had heard Roundtree's name during roll call as someone who was potentially dangerous.

Pate called for backup after Roundtree moved his body so as to shield the glove box

3

from Pate. Pate testified that he felt that Roundtree was concealing a weapon or contraband in the vehicle. Pate then asked Roundtree to turn off the car's engine and to give him the keys. When backup officers arrived around two minutes later, Pate told Roundtree to exit the car and put his hands on the vehicle. While Roundtree was doing this, Pate held his shirt so that Roundtree would not flee and also to control the defendant's actions. Pate testified that Roundtree was not following orders, and he was afraid that Roundtree would attempt to flee, based on Roundtree's history of flight. Pate patted down Roundtree and handcuffed him. Pate then placed Roundtree in the back seat of Pate's cruiser for officer safety. At this point, Pate still did not have the defendant's driver's license or vehicle registration.

Pate testified that he then called in Roundtree's name to records. Officer Stephens, one of the backup officers who had arrived, called for the K-9 unit. Pate testified that when the K-9 unit arrived, he was still doing paperwork relative to the traffic stop. The dog alerted on Roundtree's car. Pate testified that he then went to the glove box and found a pistol. Pate testified that marijuana residue was found in the floorboard of the vehicle.

Pate then identified Government's Exhibit 1, being the videotape from Pate's cruiser. Pate then identified Government's Exhibit 2, being the videotape from Officer Stephens' cruiser. Exhibits 1 and 2 were admitted into evidence. The government then played Exhibit 1 in Court. During the playing of this video, Pate pointed out that he took the defendant's keys while waiting for backup. Pate also pointed out that the defendant never produced a driver's license or registration for the vehicle which he was driving.

The videotape [Ex. 2] shows, and Pate testified, that before he placed Roundtree in the backseat of his cruiser, Pate said "you are being detained," not arrested. Pate testified that

4

Roundtree was being detained to find out whether he had a valid driver's license. At that point, Pate also asked Roundtree if there was anything in the vehicle.

Pate testified that he put a call into records and then waited on information regarding Roundtree's registration and license. At that time, according to Pate, he did not know if the car being driven by Roundtree was stolen. While the defendant was detained in the cruiser, Pate and Stephens looked into the defendant's car from outside. Stephens stuck his head inside the car when looking around. Pate further testified that it was Officer Stephens who decided to call for the K-9 unit after he saw something on the dash of Roundtree's vehicle, which gave him suspicion.

Pate testified that he had to talk to records a total of three (3) times in order to get the information that he needed. Pate testified that he was in the process of writing a summons on Roundtree for driving without a seatbelt and for having no driver's license with him and no registration on the vehicle. Pate pointed out at the hearing that his microphone stopped working early on in the course of the traffic stop, and as a result, Pate's audio on the videotape is absent. During the course of the traffic stop and before Pate received all of the information he needed from records, a citizen stopped to ask for assistance.

Pate testified that eventually, he learned that Roundtree had a valid driver's license, although it was not with Roundtree. Pate, however, never completed writing the summons on Roundtree, because the K-9 unit arrived and alerted on the vehicle before the paperwork was completed. Pate testified that until the K-9 unit arrived and the dog alerted on the driver's side and the passenger compartment of the vehicle, his intention with regard to Roundtree was to "cite him." Pate explained that he never completed the citation, because he was still doing the paperwork when the gun was found in the glove box.

On cross-examination, Pate testified that he had stopped the defendant before, but that he had not arrested the defendant on a prior occasion. Pate further testified that Roundtree was on an officer safety list due to his history as a violent offender. This officer safety list is announced at roll call, and Pate did not believe that there was a written list, as such, which was maintained. Pate testified that he did not think that Roundtree was "wanted."

Pate testified that he immediately recognized the defendant when he saw the defendant pulling out from the area of the alleyway. He said he could tell that Roundtree was driving without wearing a seatbelt before he activated his lights. Pate testified that the Knoxville City Code requires a seatbelt. Specifically, Pate testified that he believed that the Knoxville City Code required the use of the shoulder belt as well as the seatbelt. Pate testified that all of Mechanicsville was a high crime area on the day in question. Pate added, however, that Mechanicsville being a high crime area was not a factor in his decision to make the stop or a factor in the call of the K-9 unit to the stop.

Pate testified that after he stopped Roundtree's car, the first thing that he told Roundtree was to stay in the vehicle. He then asked Roundtree if he had identification and registration. He then asked Roundtree, "are you holding anything?" Pate testified that he did not tell Roundtree that the reason for the stop was because Roundtree was driving without a seatbelt. Pate testified that Roundtree told him that the vehicle belonged to his girlfriend, and that he had lost his wallet containing his driver's license. Pate testified again that Roundtree did not look in the glove box. Rather, Roundtree just put his hand quickly into the glove box and removed it while looking elsewhere.

Pate testified that near the end of the video of the traffic stop that his microphone

6

came back on. When the microphone came back on, Pate was asking Roundtree whether he had anything illegal in the car. Pate denied that he was turning the microphone on and off during the stop.

Pate testified that Roundtree never gave consent to search the vehicle. Pate testified that the diver's door of the vehicle was open and that Officer Stephens opened the passenger's door. He said that the officers looked inside the vehicle before the K-9 unit arrived. Also before the K-9 unit arrived, the two front doors of the car were closed. Pate testified that he certainly was interested in the glove box, because he thought something was in there and that Roundtree was hiding it. Pate testified that he learned of the marijuana residue from the dog's handler. He said he did not see nor recover any residue from the car.

On re-direct examination, Pate testified that the alley where he first observed Roundtree's vehicle contained a couple of "problem houses" related to narcotics and prostitution. Pate testified that a vehicle driving slowly through that area draws his attention.

Pate further testified that he has never stopped a vehicle in which the driver's seat was equipped only with lap belt and not a shoulder harness. Pate explained that he had relied on the K-9 officer to tell him that the dog had alerted on the vehicle. Pate testified that he was not trained with regard to K-9 activity, and he would not have known that the dog alerted on his own.

On re-cross examination, Pate testified that Roundtree's car was not parked in the alley but rather was moving through the alley when Pate first observed it. Pate further testified that he filed a state warrant against Roundtree for possession of the weapon. This state warrant did not mention the marijuana residue found in the vehicle. Finally, Pate testified that he did not pull the defendant over because he saw the defendant's vehicle driving through the alley.

## II. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures.  U.S. Const. amend IV.  The defendant contends (1) that the officer stopped his car in violation of his Fourth Amendment rights because he lacked probable cause to stop and seize him, (2) the length of his detention exceeded the purpose of the traffic stop, and (3) the drug dog did not provide a proper basis for the search of the car.  The Court will address each of these issues in turn.

### A.  The Stop

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer.  Id. at 388.  Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990).  In other words, probable cause means a substantial chance or likelihood of criminal conduct.  Ferguson, 8 F.3d at 392 (citing Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983)).  If a traffic stop is properly supported by probable cause, "it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop."  Id. at 391.

In the present case, Officer Pate testified that he saw a silver car traveling slowly down an alleyway adjoining houses known for prostitution and drugs.  Pate said that when the vehicle

8

emerged from the alleyway, he recognized the defendant as the driver and saw that the defendant was not wearing a seatbelt. He said he could tell that the defendant was not wearing a seatbelt because he could not see the shoulder strap by the defendant's head as he turned. He activated the lights on his cruiser and stopped the defendant.

The defendant contends that Pate did not have probable cause to believe that the defendant was not wearing a seat belt because the defendant's car could have been equipped with only a lap belt. Thus, the defendant argues that Pate stopped him merely because Pate recognized him and believed him to have a criminal history. The government maintains that Pate properly stopped the defendant to address his violation of a city ordinance requiring seatbelts.

Section 17-392(1) of the Knoxville City Code provides that "no person shall operate a passenger motor vehicle upon any road, street, or highway in the city unless such person and all passengers four (4) years of age or older are restrained by a safety belt at all times the vehicle is in forward motion." See also Tenn. Code Ann. § 55-9-603(a)(1) (imposing the same requirement upon vehicles operating on state highways). The defendant argues that Pate's inability to see a shoulder harness does not necessarily lead to a conclusion that the seatbelt laws were violated. However, Pate testified that he had made thousands of traffic stops over the course of his career and that he had never stopped a vehicle in which the driver's seat was equipped with only a lap belt and not a shoulder strap. The Court finds that based upon Pate's observation that the defendant did not have on a shoulder harness, his experience with traffic stops, and the fact that the defendant was driving a 2001 Mercury Sable, which is revealed by Exhibit 2, Pate had reasonable grounds to believe there was a substantial likelihood that the

9

defendant was not wearing a seatbelt.  Accordingly, the Court finds that the officer had probable cause to stop the defendant for violating the ordinance requiring a seatbelt.

The defendant raises other potential reasons for Pate's stopping him:  Pate knew him, Pate had been instructed to be on the lookout for him, and Pate's beliefs about his criminal history.  As long as the officer had probable cause to believe a traffic violation had occurred, his other subjective reasons for stopping the defendant are irrelevant to the Fourth Amendment analysis.  See Ferguson, 8 F.3d at 391.  Accordingly, the stop of the defendant did not violate the Fourth Amendment.

## B.  Length of Detention

The defendant contends that the traffic stop was unnecessarily prolonged beyond its purpose.  He argues that Pate had received all information necessary to complete the citations before the K-9 unit was called to the scene.  He maintains that Pate should have written the citation for the alleged violations and then released him.  He also argues that the officers did not have reasonable suspicion that criminal activity was presently afoot to permit them to prolong the stop beyond the giving of a citation.

The government contends that Pate did not exceed the bounds of the traffic stop or unnecessarily prolong the defendant's detention.  It argues that the K-9 unit arrived two minutes after Pate received the information from records on the vehicle registration and while he was completing the paperwork on the citation.  Alternatively, the government maintains that the officers had reasonable suspicion that the defendant was engaged in more extensive criminal conduct permitting his detention beyond the time necessary to conduct the traffic stop.

10

The Court finds that the following facts occurred after Pate stopped the defendant: The defendant opened the driver's door, but Pate told him to remain in the car. Pate requested the defendant's driver's license and the vehicle's registration. The defendant said he did not have his driver's license but searched in the car for the registration. The defendant did not look in the glove box. After Pate's second request that the defendant check the glove box, the defendant shielded the glove box from Pate's view with his body, opened the box a crack, thrust his left hand into the box without looking in it, and then quickly closed the glove box. While the defendant was briefly checking the glove box, Pate unholstered and then reholstered his gun. Pate called for back up, which arrived approximately two minutes later. He then got the defendant out of the car, frisked him, handcuffed him, and placed him in the patrol car.

Pate radioed records to get information on the defendant's driver's license and the car's registration. About two minutes later, records told Pate that the defendant's driver's license is valid. While awaiting further information from records, Pate and Officer Stephens inspected the car from the outside, and Stephens opened the passenger door and stuck his head inside. The officers closed both car doors, and Stephens radioed for a K-9 unit. Pate retrieved his clipboard and began filling out paperwork. A citizen stopped at the scene to inform the officers about a disabled vehicle. Records radioed Pate with information on the car's registration. The K-9 unit arrived two minutes later while Pate was still filling out the citation. The Court finds that the K-9 unit arrived just over fifteen minutes from the initial stop of the car. The drug dog was taken around the car and alerted on it. The dog's sweep of the car took approximately one minute and concluded approximately three minutes from the time Pate received the information from records on the vehicle's registration.

"Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999). In considering the reasonableness of the detention, the Court should assess "whether the officer's action was justified at its inception, and whether it is reasonably related in scope to the circumstances which justified the interference in the first place." Berkemer v. McCarty, 468 U.S. 420, 439 (1984).

An officer who stops a person for a traffic violation based upon probable cause can detain the person while he or she completes a records check and issues a citation. See United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999). "[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977); United States v. Burton, 334 F.3d 514, 519 (6th Cir. 2003). In the present case, Pate could properly ask the defendant to get out of the car and could detain him while he checked the defendant's driver's license and the vehicle's registration, neither of which the defendant could provide to Pate upon being stopped.

### 1. Arrest vs. Investigatory Detention

The Court finds that in the present case although the defendant was initially stopped and detained due to a traffic violation, the defendant's detention escalated to an arrest when he was handcuffed and placed in the back of Pate's cruiser. There is no bright line test for distinguishing an investigatory detention or stop from an arrest. United States v. Hardnett, 804

F.2d 353, 356 (6th Cir. 1986). Moreover, a show of force in effectuating a stop does not automatically convert it into an arrest. Id. at 357. "Rather, a seizure may be considered an arrest, and probable cause for the seizure may be required, when a detention is 'in important respects indistinguishable from a traditional arrest.'" Id. at 356 (quoting Dunaway v. New York, 442 U.S. 200, 212 (1979)).

When the circumstances of an investigatory detention reveal that the officer's safety is at risk, the Sixth Circuit has permitted greater intrusion into the defendant's personal freedom as a part of a Terry stop. See id. at 357 (holding that officers were justified in blocking the defendant's car, approaching with guns drawn, and ordering the occupants out of the car as a part of the Terry stop based upon tip that the occupants were armed). In the present case, the offense for which the defendant was stopped–failure to wear a seatbelt–does not indicate that the defendant could be dangerous. Additionally, Pate frisked the defendant but found no weapons. See United States v. Myers, 102 F.3d 227, 232 (6th Cir. 1996) (holding that it is well-settled that officer may frisk the subject of a traffic stop). Finally, the Court finds that the defendant was stopped in a public area during the daytime and that Pate did not get the defendant out of the car until another officer arrived. These circumstances weigh against the need for handcuffing the defendant to protect Pate. See Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 815 (6th Cir. 1999) (holding that handcuffing a suspect does not "exceed the bounds of a Terry stop, so long as the circumstances warrant that precaution"). Nonetheless, Pate testified that he was concerned for officer safety because he was aware of the defendant's history as a violent offender as well as his history of fleeing from the police. Also, Pate described the defendant as overly nervous and felt the need to unholster his service weapon when the

defendant reached into the glove box.

Even if the defendant's handcuffing can properly be characterized as an investigative detention, the detention rapidly evolved into an arrest when the defendant was placed in the patrol car. "[O]fficers cross the line from an investigatory stop into an arrest when they place a suspect in a police vehicle for questioning." United States v. Butler, 223 F.3d 368, 375 (6th Cir. 2000); United States v. Richardson, 949 F.2d 851, 857 (6th Cir. 1991). The Court finds that the defendant's being handcuffed and placed in a police cruiser to be circumstances indistinguishable from a traditional arrest. The government cites to Wellman, 185 F.3d at 656, and United States v. Bradshaw, 102 F.3d 204, 212 and n.19 (6th Cir. 1996), for the proposition that an officer can properly detain a person in the police car while effectuating a traffic stop. Although "[d]etention in a police car does not automatically constitute an arrest," id. at 211, the Court finds the combination of handcuffing *and* detention in the cruiser distinguishes this case from those upon which the government relies. Moreover, Pate's subjective belief that he was detaining rather than arresting the defendant is unavailing. See United States v. Anderson, 923 F.2d 450, 457 (6th Cir. 1991) (holding that the probable cause finding is an objective standard and does not turn upon an officer's subjective belief that he was conducting a Terry stop as opposed to an arrest). Accordingly, the Court finds that the defendant was arrested when he was handcuffed and placed into Pate's patrol car.

Citing to Tenn. Code Ann. § 55-9-603(f)(1),[1] the defendant also argues that a misdemeanor violation of the seatbelt ordinance is not an offense for which the law permits an

_____

[1]The Court notes that the defendant cites to no similar provision within the Knoxville City Code, nor is there any evidence that the defendant was traveling on a state highway at the time he was stopped.

14

arrest. This statute provides that an officer observing a seatbelt violation "shall issue a citation to the violator, but shall not arrest or take into custody any person solely for a violation of this section." Tenn. Code Ann. § 55-9-603(f)(1). The government maintains that the Fourth Amendment does not prohibit an officer from arresting a defendant for a misdemeanor traffic violation even though it is not an "arrestable" offense under state law. See Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).

An officer may arrest an individual if the officer has probable cause to believe the person has committed or is committing a felony based upon the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 230-31 (1983); United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996). This same standard applies with respect to a misdemeanor offense. Atwater, 532 U.S. at 354; Straub v. Kilgore, No. 02-5542, 2004 WL 1193841, **3 (6th Cir. May 27, 2004). The Sixth Circuit has held that the requirement under state law that a misdemeanor must be committed in an officer's presence in order for the officer to arrest without a warrant is not mandated by the Fourth Amendment. See Straub, No. 02-5542, at **3 (reasoning that the "in the presence" requirement under Kentucky law "is a state-provided right that is not grounded in the U.S. Constitution"); see also Atwater, 532 U.S. at 340 n.11 (declining to determine whether the Fourth Amendment requires that the misdemeanor be committed in the officer's presence). Pursuant to this case law, the Court concludes that Pate could arrest the defendant for transgressing the seatbelt ordinance without violating the Fourth Amendment even though state law would not permit the arrest had the defendant been on a state highway. In any event, the Court finds that Pate could lawfully arrest the defendant for driving without a license. See Tenn. Code Ann. § 55-50-531 (providing that "[e]very licensee shall have such licensee's license in

15

immediate possession at all times when operating a motor vehicle and shall display it upon demand of any officer or agent of the department or any police officer of the state, county or municipality"); see also Roberson v. Metropolitan Gov't of Nashville & Davidson County, 412 S.W.2d 902, 905 (Tenn. Ct. App. 1966) (holding that an officer can arrest a person for driving without a license even though the officer has observed no other traffic violations).

Having determined that Pate arrested rather than detained the defendant at the time he handcuffed and placed him in the police car, the Court now turns to the question of whether Pate had probable cause to support the arrest. A warrantless seizure or arrest is not unreasonable under the Fourth Amendment if supported by probable cause: "Police may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime." Caicedo, 85 F.3d at 1192. In the present case, the defendant told Pate that he did not have his driver's license. Additionally, the defendant was not able to produce the license. Thus, the Court finds that Pate had probable cause to arrest the defendant.

As an exception to the Fourth Amendment's requirement of a warrant, an officer may search the passenger compartment of a car incident to an occupant's custodial arrest. See New York v. Belton, 453 U.S. 454, 460 (1981). The fact that the arrestee is no longer in a position to reach into the car at the time of the search does not affect the propriety of the search. See United States v. White, 871 F.2d 41, 44 (6th Cir. 1989) (analyzing a situation in which the defendant was handcuffed and detained in patrol car at time officer searched his car incident to his arrest). Accordingly, the officers could properly search the car the defendant was driving incident to his arrest. The Court's findings on this issue negate the need for examination of the propriety of the

16

length of the detention or the reliability of the drug dog. Nevertheless, the Court will address these issues in case the District Court finds that the defendant was not arrested when handcuffed and placed into Pate's police car.

*2. Scope of Traffic Stop*

In the event that the District Court finds that the defendant was not arrested at the time he was handcuffed and placed in the police car, the Court will alternatively address the length of the detention as it relates to the traffic stop and/or an investigatory stop. The main thrust of the defendant's argument is that the time following Pate's receipt of the information on the vehicle's registration and the arrival and search by the drug dog exceeded the purpose of the traffic stop. The government argues that Pate was completing the paperwork on the citation during this two-to three-minute time period. The defendant argues that Pate had received all the information necessary to complete the citation (the defendant's date of birth, address, and the information on the vehicle) before the K-9 unit arrived. Although the defendant acknowledges that Exhibit 2 shows that following the receipt of the dispatch, Pate was writing information on his clipboard, he contends that it also reveals that he was engaged in conversations with the defendant on other matters not related to the traffic violation.

In <u>Illinois v. Caballes</u>, the Supreme Court held that a drug dog sniff of an individual's car during the course of a valid traffic stop does not violate the Fourth Amendment. 125 S. Ct. 834, 838. In <u>Caballes</u>, the drug dog was led around the defendant's car while the officer was writing the defendant a warning ticket for speeding. <u>Id.</u> at 836. The length of the stop, including the dog sniff, lasted under ten minutes. <u>Id.</u> In that case, the Court accepted the state court's finding that

17

"the duration of the stop was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop." Id. at 837. In the present case, the defendant argues that Pate unnecessarily prolonged the traffic stop after receiving the dispatch on the vehicle.

Initially, the Court notes that the officer may question a defendant during the course of a traffic stop, as long as those questions are reasonable under the circumstances:

> "Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public--for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent."

Burton, 334 F.3d at 518 (quoting with approval United States v. Childs, 277 F.3d 947, 954 (7th Cir.) (en banc), cert. denied, 537 U.S. 829 (2002)). Moreover, the Court finds that the additional two to three minutes that Pate took to complete paperwork following the receipt of the dispatched information on the vehicle's registration was not unreasonable but, instead, was "reasonably related in scope" to the purpose of the traffic stop, which was to cite the defendant for his violations of city ordinances. Finally, the Court finds that based upon the wait for the relevant information from records, the brief interruption by a citizen seeking assistance for a disabled vehicle, and the time needed to complete the paperwork, the sixteen-minute detention did not exceed the purpose of the traffic stop. See, e.g., Hill, 195 F.3d at 269 (finding twelve-minute detention did not exceed the scope of the traffic stop, particularly when there was no indication that the officer intentionally prolonged the stop by conducting it in the order that he did); Wellman, 185 F.3d at 656 (affirming a fifteen-to-twenty-minute detention following stop for speeding). Accordingly, the Court finds that, like in Caballes, the dog sniff occurred during

18

the course of the traffic stop and required no additional reasonable suspicion for its justification.

*3. Reasonable Suspicion*

In the event that the District Court finds that the traffic stop should have ended with Pate's receipt of the vehicle information from records, the Court will also examine whether the officers possessed reasonable suspicion to extend the detention after the traffic stop was complete. As discussed above, an officer may continue to detain an individual even after the traffic stop is completed if events or circumstances during the course of the stop give the officer reasonable suspicion that criminal activity is underway. Hill, 263 F.3d at 664. In other words, even if the purpose of the traffic stop in the present case was complete when Pate received the dispatched information on the car's registration, Pate could properly continue to detain the defendant if he had reasonable suspicion of criminal activity beyond the traffic violations.

The presence of reasonable suspicion is determined by examining the totality of the circumstances. United States v. Smith, 263 F.3d 571, 588 (6th Cir. 2001). Reasonable suspicion sufficient to support a brief detention must be based upon specific and articulable facts indicating that the person has or is about to commit a crime. Terry v. Ohio, 392 U.S. 1, 21 (1968); United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002). Although an officer may not rely upon a mere hunch to support a Terry stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002); Martin, 289 F.3d at 398.

In the present case, the totality of the circumstances reveals that Pate had reasonable suspicion to detain the defendant beyond his receipt of the information on the car. First, Pate

observed the defendant traveling slowly down an alley adjacent to houses reputed to be locations for drugs and prostitution.  Presence in an area known for criminal activity can provide support for reasonable suspicion.  United States v. Bailey, 302 F.3d 652, 659 (6th Cir. 2002).  Although Pate stated that he did not rely on the fact that the Mechanicsville area was a high crime area to stop the defendant, he said that the defendant's location in the alley near these houses caught his attention.

Pate also testified that the defendant was "overly nervous" as compared to most individuals who are stopped.  While such behavior alone cannot be the sole basis for reasonable suspicion, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Illinois v. Wardlow, 528 U.S. 119, 124 (2000).  The defendant points to Pate's unholstering his gun as an explanation for the defendant's nervousness.  The Court notes that Pate's testimony indicates he noticed the defendant's extreme nervousness before the defendant turned toward the glove box and Pate unholstered his weapon.  Moreover, Pate's testimony and the videotape reveal that the defendant had his back to Pate most of the brief time that Pate unholstered his gun.  Thus, the Court finds that Pate's unholstering his weapon was not the reason for the defendant's nervousness.

Even beyond the defendant's nervousness, Pate testified that the defendant behaved in an unusual manner when asked to produce the car's registration.  He said the defendant searched throughout the passenger compartment, but not in the glove box, even after he suggested that the defendant check the glove box because this is where many people keep the registration.  Upon being asked a second time to check the glove box, the defendant attempted to shield the glove box from Pate's view with his body.  He opened the glove box a crack, stuck his hand inside

without looking, quickly pulled his hand out, and shut the glove box. Pate testified that these actions caused him to suspect that the defendant was hiding some type of contraband, either drugs or a weapon, in the glove box. The totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). Although each of the circumstances discussed in this case–traveling in the alley, nervousness, and the unusual behavior regarding the glove box–is susceptible to an innocent explanation, the combination of these factors in the context of the stop constitute specific and articulable facts giving rise to a reasonable suspicion that the defendant was engaged in criminal activity. The Court finds that the presence of reasonable suspicion permitted the officers to detain the defendant for an additional two minutes after receiving the vehicle information until the K-9 unit arrived.

## C. Search of the Car

Finally, the defendant in his supplemental brief [Doc. 18] faults the search of the car, contending that the drug dog "was less than accurate as evidenced by the results in this case alone." He asserts that despite the dog's apparently alerting on the trunk and passenger side of the car, drugs were not found in those locations. Moreover, he argues that the marijuana residue that Pate heard about was not seen by Pate nor mentioned in Pate's police report or the criminal warrant. He asserts that it is the government's burden to prove that an exception to the warrant requirement exists and that the government has failed to present any evidence that the drug dog

involved in this case was reliable or well-trained.

The government responds [Doc. 19] that the defendant's contentions are not supported by the record. It argues that Pate's testimony that the dog alerted on the car and that the handler told him that the dog alerted on the car are uncontroverted. It also maintains that Pate testified that other officers recovered items from the car and that marijuana residue was recovered from the car.

Initially, the Court notes that the issue of the drug dog's alert is immaterial because the Court has found that the defendant's car was properly searched incident to his arrest. Nevertheless, the Court will address this issue in the event that the District Court determines that the defendant was not arrested at the time he was handcuffed and placed in the police car.

Pursuant to the automobile exception to the warrant requirement, when "police have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any contents located within it." United States v. Mans, 999 F.2d 966, 969 (6th Cir.), cert. denied, 510 U.S. 999 (1993); see also California v. Acevedo, 500 U.S. 585, 580 (1991); United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998). "A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." United States v. Navarro-Camacho, 186 F.3d 701, 706 (6th Cir. 1998); see also United States v. Page, 154 F. Supp. 2d 1320, 1326 (M.D. Tenn. 2001) (characterizing this holding as well-settled). "[A]n alert in the context of a canine narcotics sniff indicates that narcotics are present in the item being sniffed or have been present in such a way as to leave a detectable odor." United States v. Boxley, 373 F.3d 759, 761 (6th Cir. 2004). In the present case, the Court finds that Pate testified that the dog's handler confirmed for him that the drug

22

detection dog had alerted on the defendant's car. This information provided probable cause to search the defendant's car, if the dog was trained and reliable.

The Supreme Court has held that a dog sniff of items located in a public place is not a "'search' within the meaning of the Fourth Amendment." United States v. Place, 462 U.S. 696, 707 (1983). Nevertheless, "[f]or a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established." United States v. Diaz, 25 F.3d 392, 394 (6th Cir. 1994). Evidence of a dog's training and reliability may be in the form of testimony as to the dog's record by the dog's handler. Boxley, 373 F.3d at 761. The Sixth Circuit has also held that the government does not have to show that the dog is one hundred percent accurate. Id. Instead, "[w]hen the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the 'credibility' of the dog." Diaz, 25 F.3d at 394; see also Boxley, 373 F.3d at 761 (concluding that "after it is shown that the dog is certified, all other evidence relating to his accuracy goes only to the credibility of the testimony, not to the dog's qualifications").

In the present case, the government presented no evidence regarding the drug dog's training or certification. In fact, Pate, the sole witness at the suppression hearing, testified that because he was not a K-9 officer, he clarified with the dog's handler that the dog had alerted on the defendant's car. The defendant suggests that because the government has the burden of proving exceptions to the warrant requirement, it bears the burden of showing that the dog used in the present case was reliable or well-trained. He also contends that the fact that the drug dog

23

essentially falsely alerted in this case (because no drugs were recovered from the car) calls the dog's reliability into question. The Court has already found that the record shows that the dog alerted and that marijuana residue was found in the car. The more troubling question is whether the dog was trained.

The defendant is correct that the government bears the burden of proving that an exception to the warrant requirement was present. See Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); United States v. Oliver, 686 F.2d 356, 371 (6th Cir. 1982) (holding that the "burden rests on the Government to establish that a warrantless search was conducted within the narrow confines of an established exception to the Fourth Amendment"). As discussed above, in order to show that probable cause existed for the automobile exception to apply, "the training and reliability of the dog *must* be established." Diaz, 25 F.3d at 394 (emphasis added). As the government bears the burden of showing that the automobile exception applies, it logically follows that the government would have to show the drug dog was trained and reliable, a necessary component of probable cause stemming from a drug dog's alert.

The Court has not located, nor has the defendant cited, any Sixth Circuit case that expressly places the burden of proving the drug dog's training and reliability on the government. Nevertheless, the Sixth Circuit's discussion in Boxley of the type of proof required, indicates that the burden lies with the government: "We also determined that it is not necessary for the government to show that the dog is accurate one hundred percent of the time, because 'a very low percentage of false positives is not necessarily fatal to a finding that a drug detection dog is properly trained and certified.'" Boxley, 373 F.3d at 761 (quoting Diaz, 25 F.3d at 396). Additionally, several district courts, including the Southern District of Ohio, have expressly

placed the burden of showing the drug dog to be well-trained with the government. See United States v. Lambert, 351 F. Supp. 2d 1154, 1162 (D. Kan. 2004) (holding that in "proving probable cause to search the defendant's pickup, the government must prove that the dog was trained and certified at the time of the alert"); United States v. Outlaw, 134 F. Supp. 2d 807, 814 (W.D. Tex. 2001) (observing that "once the government proves that [the] canine inspection team was trained to detect contraband items, the government does not have the additional burden of producing field work records or detailed training records in order to establish the reliability of the canine alert"), aff'd by 319 F.3d 701 (5th Cir. 2003); see, e.g., United States v. Huerta, 247 F. Supp. 2d 902, 908 (S.D. Ohio 2002) (finding that the government had "met its burden of proving, by a preponderance of the evidence," that the drug dog was properly trained); United States v. Neatherlin, 66 F. Supp. 2d 1157, 1161 (D. Mont. 1999) (finding that the government met its burden of proving the drug dog's reliability). This authority persuades the Court that its interpretation of Diaz and Boxley is correct.

Accordingly, because the government bears the burden of proving that the drug dog used in the present case was trained and reliable and because the record is devoid of any information on the dog's training, the Court finds that the dog's alert on the defendant's car cannot provide probable cause to search the car. Moreover, the Court finds that the additional factors known to the officers–the defendant's driving slowly through the alley by the houses known for drugs and prostitution, the defendant's extreme nervousness, and the defendant's unusual behavior with regard to the glove box–while sufficient to provide reasonable suspicion that a crime was afoot, are not sufficient to provide probable cause to search the car. Thus, if the District Court determines that the defendant was not arrested but was detained at the time he was handcuffed

and placed in Pate's cruiser, then the probable cause for the search of the defendant's car must come from the dog's alert. In such case, the Court would recommend that the evidence taken from the defendant's car be suppressed due to the government's failure to prove the applicability of the automobile exception. Aside from the drug dog issue, the Court has found, as discussed above, that the defendant was arrested and that the search of the car was proper as incident to his arrest. It is upon this finding that the Court recommends the defendant's suppression motion be denied.

## III. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress Evidence [**Doc. 12**] be **DENIED**.[2]

Respectfully submitted,

_____ s/ H. Bruce Guyton _____
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).